## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-mj-226** |
| **ISHMAEL KEITH REID,** | |
| **Defendant.** | |

## <u>MOTION FOR REVIEW AND APPEAL OF RELEASE ORDER</u>

The United States of America, by and through its undersigned counsel, respectfully appeals, and seeks this Court's review of, the magistrate court's September 22, 2025, Order denying its motion for pretrial detention.

The defendant, Ishmael Keith Reid, poses an unmitigable risk to community safety and should be detained pending trial.  Reid set up chat rooms on Discord to trade child pornography material and distributed a video of child pornography to another user. Reid also previously sent sexually explicit material to a 16-year-old minor child over Snapchat and solicited child brides from online users on dating websites. Reid was charged by complaint with Distribution of Child Pornography, in violation of 18 U.S.C. §2252(a)(2).

The government sought pretrial detention of the defendant pursuant to 18 U.S.C. §§ 3142(e)(3)(E) (rebuttable presumption in favor of detention), and 3142(f)(1)(A) (crime of violence) because there is no condition or combination of conditions of release that will reasonably assure the safety of any person or the community.  The magistrate court held a detention hearing on September 22, 2025.  The court ordered the defendant released to the custody of his mother who resides at a senior living facility on 5th Street in Southeast Washington, D.C.  The magistrate court concluded that the third-party custodian plan would adequately mitigate the risk to the community posed by the

defendant if he were to be released. The magistrate judge also indicated that this was "an extremely close call."

The magistrate court erred by not adequately considering the Section 3142(g) factors as they apply in this case, including the nature and circumstances of the charged child sexual exploitation offense and the nature and seriousness of the danger to any person or the community. Moreover, the proposed third-party custodian would not reasonably ensure the safety of the community. For reasons that follow, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

## **BACKGROUND**

### A.  **Offense Conduct on Discord**

On or about August 10, 2025, a user of Discord, a social media and gaming platform, utilizing screen name ishmael1997, uploaded a 7-second video of a minor female with semen on her lips and chin. An erect penis then appears from the right side of the frame before the video ends. The account "ishmael1997", as detailed below, was operated by Reid.

Discord additionally provided chat logs from Reid's account. The following are some of those chats between Reid and other Discord users which occurred on August 10, the same day the above-described video was distributed. These chats indicate that Reid discussed the above-described video with the Discord user:

Discord User 1: fire vid king

REID: Thanks bro, you have any

Discord User 1: Sadly no. Im a new traveler around these parts

REID: Lol welcome

Discord User 1: That was a lot of nut. I also noticed your shit huge it definitely wouldn't fit I don't think you built for this hobby haha. Ain't to no what that stuffing into anything. Definitely congrats

tho.

REID: lol with time you can make it fit in the smallest holes. I made it fit in an infant.

Discord User 1: Really?

REID: Yeah didn't want to split her so only used tip until it started to stretch a little.

      Discord separately reported the following chat exchange between the defendant and another

Discord user:

REID: You want me start or wait?

Discord User 2: Ofc, start whenever you want. Like I said its all free.

REID: [Distributes what appears to be a video link]

REID: Had to release. Walt you want to add any?

Discord User 2: Send as much as you want man. Hopefully we'll get some other ppl to sent too. I

gotta redownload mega[1] rq.[2]

REID: I'll wait to others start sending to I feel lonely.

REID: I have a link to a cp[3] group

Discord User 2: Send it to me

REID: Got you. [Reid then sends a link]

Discord User 2: Its sad how they make ppl pay. If I can get my mega account back, I'm giving all

my vids for free bro.

REID: its fine with me its worth it because its free if you have cp

      Discord reported that on August 10, the defendant engaged in another discussion with a third

---

[1] Mega is a cloud based file storage website that is commonly used to distribute large amounts of child pornography.
[2] "rq" is a slang term for "real quick."
[3] "Cp" commonly refers to child pornography

Discord user where Reid solicited child pornography:

Discord User 3: What are you looking for exactly?

REID: Cp. Girl or boy it don't matter.

In a separate conversation, Discord reported that the defendant asked another user if he sells child pornography:

REID: You sell cp

Discord User 4: No ??? Ageplay. Not cp

REID: You want to join this group to see some?

Discord User 4: No that's weird get out of my dms

      Discord reported that Reid then offered to distribute a link to a child pornography group to a fifth Discord user on August 10:

Discord User 5: Hey how are you doing

REID: I'm good. I have a group if you like cp

Discord User 5: That's good. Oh really!! Let me see?

REID: I need to make sure you safe to join send a pic of some cp you have first.

      Discord reported that the defendant discussed trading child pornography with a sixth Discord user:

Discord User 6: Cheese pizza?

REID: You have cheese pizza? Yes. Do you?

Discord User 6: Yup.

REID: You have telegram?

Discord User 6: Yeah

REID: [provides Telegram username] That's my telegram name message me there and we will trade.

      Finally, Discord reported that Reid communicated with a seventh Discord user on August 10

related to purchasing child pornography:

REID: Trade? I got cp also

Discord User 7: Selling only please

REID: Show proof of vids

Discord User 7: Lets chat on telegram

REID: It won't let me message first [Reid then provides his telegram username]

Discord also indicated that the defendant posted in public Discord channels that he was looking to trade child pornography with other users and was asking if other users had child pornography.

On or about August 11, 2025, Discord reported this video upload to the National Center for Missing and Exploited Children (NCMEC), along with the internet protocol address (IP address) used to upload the video. The reported IP address was used to upload the above-described video file depicting child pornography and log in to the Discord account associated with Reid. The IP address used for the upload and login, 98.218.94.222, is a Comcast IP address. Comcast provided law enforcement with the subscriber information which indicated that the subscriber is Lenora Reid, XXX 5th Street Southeast, Apartment 427, Washington, DC 20003. Lenora Reid is the defendant's mother.

On September 18, 2025, law enforcement spoke with a representative from Discord, who advised the above-described child pornography video uploaded by Reid was posted in a smaller Discord "server[4]" and was visible to all members of that server. The video was initially reported by another user, which then triggered a review of the video by a Discord Trust & Safety employee, who reported the information to NCMEC. The username ishmael1997 also contains Reid's first name and

---

[4] A Discord server is a private or public digital community space where members can communicate through text, voice, and video. It is a customizable for a specific group or interest and organized into text and voice channels for different discussions or activities.

1997, which is the year of Reid's date of birth.

A check of law enforcement databases showed a Metropolitan Police Department (MPDC) report from February 6, 2025, in which MPDC responded to XXX 5th Street Southeast, Apartment 427 and spoke to both Lenora Reid and Ishmael REID. The report stated Lenora Reid told responding officers that her son Ishmael REID had moved in with her to assist with her recovery from surgery.

### B. Snapchat Conduct

A query of NCMEC's CyberTipline Report database for IP address 98.218.94.222 (the same IP address used to upload the above-described child pornography video) revealed a CyberTip filed by Snapchat on February 14, 2025. The CyberTip stated that Snapchat username "key253874," associated with the above-described Comcast IP address, engaged in communication with a username belonging to a sixteen-year-old minor female victim (MV-1) that involved potential online enticement.

The CyberTip contained a portion of the conversation between user "key253874," and MV-1, as well as one image and one video uploaded by the users. The conversation is detailed below:

| key253874 | Huh ? |
|---|---|
| MV-1 | Do you think I'm older or younger than 1i |
| MV-1 | 18* |
| key253874 | Bro goodbye this has no meaning at this point |
| key253874 | Idek[5] if you look good |

MV-1 then sent an image which depicts a clothed pubescent minor female visible from the

---

[5] "Idek" appears to be a typo for "Idec" which is commonly used slang for "I don't even care."

neck up in a "selfie" style.

| key253874 | Didn't prove anything |
| key253874 | And idc to ask |

User "key253874" then sent a video, approximately three seconds in length of an apparent adult male laying on a bed with his penis exposed.

The CyberTip also indicated that phone number 240-XXX-4618 (4618) was associated with user "key253874." On April 7, 2025, summonses were served to Snapchat and T-Mobile to obtain subscriber information for user "key253874" and 4618 respectively. The return provided by Snapchat confirmed that 4618 was used to create the account and was a verified phone number. Additionally, the return indicated that the account was created on February 12, 2025, and was still active. The return provided by T-Mobile indicated that REID is the subscriber of 4618 as of January 28, 2025.

### C. Cupid Media Report

In April 2025, the HSI Washington D.C. Child Exploitation Group (CEG) received information from HSI International Operations that, in January and February 2025, Ishmael Keith REID ("REID") was utilizing several websites owned by Cupid Media[6] to find a minor female to be his wife. REID had engaged in conversations with several users offering to pay money for females as young as ten years of age. The information was referred by the Australian Federal Police as part of standard reporting practices by both them and Cupid Media.

---

[6] According to open-source information, **Cupid Media** is an online dating company that operates 33 active niche dating websites based on religion, ethnicity, lifestyle and special interests. The network of sites is available in multiple languages. Cupid Media is based on the Gold Coast in Queensland, Australia.

As part of their reporting process, Cupid Media provided the content of the messages exchanged by REID and other users. In the messages, REID engages with individuals in Congo, South Africa, Brazil, and Colombia. For example, on January 11, 2025, REID has the following conversation with an individual in Congo:

| REID | Hello how are you? Can you find me a wife in Congo if I pay you? |
|---|---|
| USER 23897836 | Hello I'm good how about you yeah |
| REID | Yes I'm good so I have a question |
| REID | If I came to visit the condo in September and I brought with me 1,000 usd to give to you. Could you find me a child wife ? |
| USER 23897836 | Okay asked |
| USER 23897836 | Just say what you want |
| REID | I want young girl |
| REID | And I'll pay you |
| REID | How young can you find me ? I want really young |
| USER 23897836 | Which age |
| USER 23897836 | You say age |
| USER 23897836 | 10 for what |
| REID | 10 |
| REID | Age 10 |
| USER 23897836 | 10 for what |
| USER 23897836 | Doing what with kids of l0years old |
| REID | Marriage |

| USER 23897836 | With kids of l0years |
|---|---|
| USER 23897836 | Did you hear what you say |
| REID | You don't want up help? |
| REID | Can you help or no ? |
| REID | What if just for sex then ? |

In another conversation on January 9, 2025, REID identifies himself and provides a US phone number while trying to move the messaging over to the WhatsApp platform:

| REID | Can you help me find a wife and I'll pay you if you find me one |
|---|---|
| USER 24052625 | Yes sure |
| USER 24052625 | Are you interested? |
| REID | Yes |
| REID | What's your what'sapp? |
| USER 24052625 | 09551549520 |
| USER 24052625 | That's my WhatsApp |
| REID | Didn't work |
| USER 24052625 | Why |
| REID | +1 (202) 258-6991 |
| REID | Try mine |
| USER 24052625 | Ok |
| USER 24052625 | Wait |
| USER 24052625 | Didn't work |
| REID | We can just talk on here for now |

| REID | Can you find me a wife before July that's when I will be coming there to visit |
|------|-------------------------------------------------------------------------------|
| REID | I want young though no older than 13 |
| USER 24052625 | Oh ok |
| USER 24052625 | Yes of course |
| REID | Ok perfect |
| REID | I need pictures to see which one I will want but I need your whatsapp to work first |
| USER 24052625 | Yeah |
| USER 24052625 | What is your name of your Whats.App |
| USER 24052625 | Just search mine |
| USER 24052625 | Jamaica Canoy |
| REID | Still won't work |
| REID | Mine is |
| REID | Ishmael Reid |

Throughout the various conversations, REID offered to pay between $1000 and $3000 USD for finding him a wife and varied the ages of the girls that he requests. He did, however, always state that the age must be below seventeen. REID also told the individuals that he will be arriving in their respective countries either in July or September 2025[7].

---

[7] A database check has not shown any travel booked by REID at the time of this writing.

In February 2025, REID focused solely on Colombia and continued to offer money to individuals to find him a wife. He changed his age requirement to fifteen years of age and below and stated that he would be visiting Colombia in March 2025.

Subscriber information for REID's Cupid Media account showed him as the subscriber with a billing address of XXX 5th Street SE, Washington, D.C. 20003, a phone number of 202-XXX-6991, and the registered email address as reidXXXXX@gmail.com. Additionally, Cupid Media provided a log of IP addresses used by REID to access the sites. Although, most of REID's logins were done utilizing an iCloud Private Relay[8], several logins from December 20 – 22, 2024 were done from static IP address 98.218.94.222, provided by Comcast. This is the same IP address used to upload the above-described video over Discord which constitutes the offense conduct.

## PROCEDURAL HISTORY

The defendant made his initial appearance before this court on September 22, 2025.  The government moved for detention and agreed to move forward with the detention hearing the same day to accommodate the proposed third-party custodian.

The proposed third-party custodian is Lenora Reid, the defendant's mother. Ms. Reid testified that she lives in a senior citizen apartment building located on 5th Street Southeast, Washington, D.C. She further testified that she lives alone, is wheelchair bound and has health issues. She stated that the defendant has been residing with her for approximately two years due to her health issues. She testified that during that time, she never suspected that the defendant was engaging in any criminal or inappropriate conduct. She further stated that she trusted him completely and that he is well regarded by other residents in her apartment building. She testified that there are approximately 200 units in her building and that none of the residents of the units ever receive visitors who are minor

---

[8] A privacy feature within iCloud that helps hide a user's IP address and browsing activity. Similar to a VPN.

children, including visits from grandchildren. Ms. Reid stated that she has an Android cellular telephone and a Fire Stick television in the house which both utilize the internet. She stated that she has changed the password on her phone and intends to lock it in a safe and that she will disable the internet in her apartment. Ms. Reid testified that she is unfamiliar with applications like Discord, that she has heard of Snapchat but has not used it, and is unfamiliar with dating websites like the ones Reid utilized in the Cupid Media report. Ms. Reid did not indicate that anyone would be available to monitor the defendant if she had to leave the house.

Pretrial services did not approve Ms. Reid's residence for the defendant's release because 1) there are other apartments within the building that will have wireless internet and 2) the residence is within close proximity to schools.

The Court agreed to release the defendant, but indicated this was an extremely close call. The Court stated that the danger to the community posed by the defendant only existed if the defendant gained access to a digital device and that Ms. Reid could reasonably assure that the defendant did not gain access to a device. The Court ordered Ms. Reid to ensure that the defendant did not have access to devices, ordered GPS monitoring, and home incarceration.

On September 24, 2025, the government contacted the building where Ms. Reid resides and where the defendant has been residing with her. The building is managed by D.C. Housing Authority. The building management stated that the only individuals who are allowed to reside in the building were individuals over the age of 62 or their home health aides. Moreover, in order for a person to legally reside in the building, they had to be on the lease.

The government now respectfully submits this Motion for Review.

## **LEGAL STANDARD**

Title 18, United States Code, Section 3145(a) provides:

(a) **Review of a release order** - If a person is ordered released by a magistrate, . . .

(1) the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly.

On the government's motion to review a release order, this Court considers *de novo* the magistrate court's denial of pretrial detention. Although the D.C. Circuit "ha[s] not squarely decided the issue," *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), every other circuit to have analyzed the issue has concluded the standard is *de novo*. *See United States v. Blackson*, No. 23-CR-25, 2023 WL 1778194, at *5 & n.2 (D.D.C. Feb. 6, 2023), *aff'd,* No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) (citing decisions from the First, Second, Third, Fourth, Fifth, Eighth, Ninth, and Tenth Circuits that stand for this proposition).

In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. It may take additional evidence from new witnesses or consider arguments not raised previously. In short, the Court may proceed as best enables it to resolve the question posed: whether any condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466 (D.D.C. 2016)

(citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Here, Congress has specified that for an offense involving a minor victim under Section 2423, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n. 2 (D.D.C. 2011) ("[C]ircuits that

14

have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f).  Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer.  *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992).  A pretrial detention hearing should not be used as a discovery device.  *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

## ARGUMENT

For reasons that follow, the defendant poses an unmitigable risk to community safety. Because there are no conditions of release adequate to reasonably assure community safety, this Court should reverse the magistrate court's release order and detain the defendant pending trial.

### I.    The Statutory Factors All Weigh Heavily in Favor of Detention.

#### A.  Nature and Circumstances of the Charged Offense

The nature and circumstances of the charged offense weigh heavily in favor of detention. Here, the defendant distributed an image of child pornography and, at least in one chat discussion on Discord that same day, implied that it was an image he produced himself. Discord reported that "Discord has reason to believe that the video content referenced could possibly be the video content previously reported" in the CyberTip which reported the above-described child pornography video. Discord User 1 commented to Reid about the size of Reid's penis based on viewing a "vid." This appears to be a reference to the penis that is visible in the above-described child pornography video.

Reid not only failed to deny that his penis is visible in the video, but further stated that he previously raped an infant with his penis. Reid provided a detailed account of his rape of the infant, stating that he only used the tip of his penis to rape the infant because he "didn't want to split her." On August 10, the same day that the above-described video was distributed, the defendant communicated with seven Discord users in separate conversations regarding his sexual interest in children. He compulsively asked other users if they had child pornography they wanted to trade or if they wanted links to groups that were trading child pornography. For example, the defendant sent a link to a group trading child pornography that charged users to join, but allowed users to join for free if they had child pornography to distribute.

Additionally, in multiple conversations with Discord users, the defendant asked to move the conversation from Discord to Telegram. Telegram is an encrypted messaging application that is known for not cooperating with law enforcement. By moving the conversation to Telegram, the defendant was making every effort to ensure that his conduct would not be detected by law enforcement. This indicates that the defendant is knowledgeable regarding how to use technology to conceal his criminal conduct.

The nature and circumstances of the offense in this case are extremely alarming. The defendant, by his own admission, has sexually abused an infant child who would have bene too young to report the abuse. The defendant compulsively communicated with multiple Discord users within the course of one day which shows that he cannot control his need to consume child sexual abuse material and his predisposition to sexually abuse children. The defendant's inability to control this compulsion, coupled with his ability to conceal his conduct demonstrates that he poses a significant risk to the community if released.

Indeed, the charged offense both (i) is the basis for the statutory presumption of dangerousness and (ii) involves a minor victim, which are two factors this Court is required to

consider in assessing the nature and circumstances of the offense. *See* 18 U.S.C. § 3142(G)(1) ("The judicial officer shall . . . take into account the available information concerning— the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a minor victim . . . ."). *See Breeden*, 2015 WL 13310427, at *7 ("Congress specifically directed courts to consider whether a defendant is charged with a 'crime of violence' when assessing the nature and circumstances of the offense factor, and it designated a violation of section 2423(b) to be a crime of violence."); *United States v. Beauchamp-Perez*, 822 F. Supp. 2d 7, 10 (D.D.C. 2011) ("With respect to the nature and circumstances of the offense, the charged offense is serious and involved traveling with intent to have sex with a twelve year-old minor victim. The Court finds that this factor supports detaining the defendant; indeed, it is the basis for the presumption in favor of detention."). The seriousness of the offense is also reflected by Congress's judgment that those convicted of the charged offense face up to 20 years' imprisonment upon conviction and a five year mandatory minimum. *See* 18 U.S.C. § 2252(a)(2).

Judges have also found that detention is appropriate for individuals charged with similar conduct. In *United States v. Farina*, 25-cr-232 (RCL), Judge Lamberth detained the defendant, who was charged with distribution of child pornography, following an appeal of the magistrate's detention order. Farina proposed release to a group of third-party custodians including his mother and father. Judge Lamberth noted that the statements made by the proposed third-party custodians indicated that they were not familiar with his consumption of child pornography and that they would not be able to prevent his continued access to those materials in the future. In *United States v. Victor Blythe*, 25-cr-253 (DLF) Judge Friedrich denied the defendant's motion for release following the magistrate's detention order. The defendant was charged with distribution of child pornography and, similar to the instant matter, engaged in online communications with other individuals about his sexual interest in children and his efforts to sexually abuse children. In that case, there was no

17

evidence that the defendant actually engaged in hands on abuse, only his admissions that he was talking to minor boys about sexual encounters. Blythe's proposed third-party custodian was his brother, who resided with him at the time of the offense conduct. Judge Friedrich detained the defendant because of his compulsive communications regarding the sexual abuse of children and the fact that his third-party custodian was unaware of his criminal conduct prior to his arrest.

Accordingly, the nature and circumstances of the charged offense weigh heavily in favor of detention.

### B.  The Weight of the Evidence Against the Defendant

The weight of the evidence against the defendant is very strong and weighs in favor of detention.  The evidence supporting the identity of the defendant as the individual who posted the video to Discord is strong. The username that posted the video, Ishmael1997, is the defendant's first name and year of birth. The video was posted from the IP address associated with the defendant's mother's residence.

A district court must consider the weight of the evidence when assessing whether the defendant is a danger or poses a risk of flight and has broad discretion to determine the relative weight of each of the four Bail Reform Act factors.  *See United States v. Blackson*, No. 23-CR-25 (BAH), 2023 WL 1778194, at *9 (D.D.C. Feb. 6, 2023), *aff'd*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023) ("First, nothing in the BRA's text requires or alludes to a differing weighing of the factors nor any hierarchy among the factors.").  No factor is categorically of greater or lesser weight than the others.  As the Second Circuit Court of Appeals observed:

> Although § 3142(g) of the Bail Reform Act lists various factors to consider, it says nothing about the relative weight a court should give them when deciding whether to release or detain a defendant. *See generally* 18 U.S.C. § 3142(g). That silence is unsurprising, because the weight given to each factor will inevitably vary from case to case, and might even vary depending on whether the inquiry relates to a defendant's danger or to his risk of flight. What is more, certain factors might interact with one another in a particular case in a way that alters a court's analysis of a defendant's

danger to the community or flight risk.

*United States v. Zhang*, 55 F.4th 141, 149-50 (2d Cir. 2022). In *Zhang*, the Second Circuit found that the district court gave appropriate weight to the second factor – the weight of the evidence – in determining that there was "significant evidence" that Zhang had in fact committed the charged murder. *Id.* at 150-51. Affirming the district court's relative reliance on the weight of the evidence in determining dangerousness, the court explained:

> In making a predictive assessment of the defendant's future dangerousness if released into the community, common sense and § 3142(g)(2) aligned with the district court's consideration of the strength of this evidence, especially coupled with the nature of the charged offense. It stands to reason that the more strongly the evidence indicated that the defendant committed the murder, the more likely he poses a danger to the community if released on bail.

*Id.* Similarly, in considering whether the defendant poses a risk of flight, the court explained that where "the evidence against a defendant is strong, it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight. *Id.* at 151-52.

The *Zhang* court's analysis has been cited approvingly in the District Court of the District of Columbia in *Blackson*, and its analysis holds true here as well. *Blackson,* 2023 WL 1778194, at *9-10. The evidence against Reid is strong, suggesting a heightened danger to the community. The strength of the evidence strongly supports detention, as it indicates the significant risk of danger posed by the defendant.

### C.  The History and Characteristics of the Defendant

While the defendant does not have any criminal history, there is reason to believe that he has engaged in criminal activity prior to his conduct in this case. Both Snapchat and Cupid Media reported to law enforcement that the defendant has previously engaged in alarming conduct. Snapchat reported a conversation the defendant had with an identified 16-year-old minor child. After

the minor child indicated to the defendant that she was under 18-years-old, he sent the minor child a photograph of his penis. Snapchat also indicated that Reid used iCloud Private Relay, which acts as a VPN and ensures that the defendant's activity could not be traced back to his IP address. This, in conjunction with his use of Telegram, shows that the defendant has the capability to conceal his criminal conduct. An individual who can engage in this pattern of deceit is not one who can be trusted to abide by the law if released.

Cupid Media reported several conversations in which the defendant was asking other individuals online to assist him with purchasing a child bride.

Additionally, the absence of prior criminal convictions is not sufficient to rebut the statutory presumption of dangerousness on the facts of this case. *See, e.g. Breeden*, 2015 WL 13310427, at *7 ("But the inferences the defendant is asking the Court to draw do not go far enough. The Court is not certain that a lack of more incriminating evidence constitutes 'evidence' that rebuts the presumption arising from the undisputed facts of the case." (emphasis in original)); *Pope v. United States*, 739 A.2d 819, 826 (D.C. 1999) (explaining that, under the D.C. Code's rebuttable presumption, if a court makes the requisite finding that a defendant committed certain crimes, then the "defendant is presumed to be dangerous (and subject to preventive detention) even if his prior record is clean and if no other showing of dangerousness is made"). In fact, the absence of a prior criminal history is evidence of the defendant's ability to engage in a pattern of deceit and conceal his criminal conduct from law enforcement and from those closest to him. This makes the defendant particularly dangerous to the community if he is released because of his ability to hide his criminal conduct.

Thus, the defendant's history and characteristics weigh in favor of detention.

### D.  **The Nature and Seriousness of the Danger to any Person or the Community**

Finally, the sexual exploitation of children presents a serious danger to the community,

which results in severe mental, emotional, and physical trauma to the countless children who are victimized by offenders like the defendant and others with a demonstrated sexual interest in children. It is this type of harm that led Congress to create the statutory presumption of detention in these cases.

The evidence in this case establishes that the defendant poses a grave danger to the community. As discussed above, the defendant not only distributed a child pornography video in Discord, but implied that the video was self-produced and compulsively spoke to other Discord users about his sexual interest in children, his prior abuse of an infant, and his desire to trade child pornography. The prior reports from Snapchat and Cupid Media also indicate that the defendant's compulsive need to communicate with others about his sexual interest in children has been a long-standing issue. The defendant's interest extends beyond consuming this material online and has extended to a desire to harm children in the real world. This makes the defendant particularly dangerous and weighs heavily against release. The potential harm to the community if the defendant is released is not restricted to consuming CSAM—it is that the defendant could sexually abuse a child. Given the defendant's compulsive behavior and his ability to use technology to conceal his conduct, there is no condition or combination of conditions that could ensure the safety of the community, particularly children in the community.

**II.    The Magistrate Court's Release Order Should be Reversed.**

The magistrate court's release order should be reversed. In this jurisdiction, magistrate judges generally detain defendants charged with child pornography or child exploitation offenses due to the difficulty in adequately monitoring their conduct while on release. These are offenses that occur online and are easy to conceal from the people closest to the defendant. In this case, the proposed third-party custodian, the defendant's mother, resided with the defendant at the time he committed the instant offense—however, she did not detect his criminal conduct. This demonstrates that the

21

defendant was able to able to conceal his criminal conduct from the very person who is supposed to monitor his compliance with pretrial release conditions and detect if he is engaging in further criminal conduct.  The defendant's commission of the instant offense while he resided with his mother significantly undercuts any claim that she can serve as an appropriate third-party custodian. Moreover, there is no information as to who would monitor the defendant if his mother had to leave the house.

These are the same types of issues that judges across the courthouse have raised in deciding to detain defendants in these cases:

- *United States v. Jose Martinez,* 22-cr-78 (ABJ) – Judge Howell affirmed the magistrate judge's decision to detain a defendant charged with possession of child pornography where his mother and sister were considered inadequate third-party custodians due to their presence in the home when the defendant committed his offense.

- *United States v. James Carroll*, 24-cr-544 (APM) – Judge Mehta denied defendant's motion to review the magistrate judge's detention order for defendant charged in connection with chatting with an undercover agent, where his wife, who resided with him at the time of the offenses, was his proposed third-party custodian. Judge Mehta went on to say that even if no access to devices was a condition of his release, "I simply just don't trust, given his compulsiveness and his demonstration of a high degree of sophistication, that he won't be motivated to somehow gain access to devices."

- *United States v. Eduardo Vides*, 24-cr-216 (BAH) – Judge Howell granted the government's motion to detain the defendant who was charged with distribution of child pornography and holding that the defendant's family members were inadequate

third party custodians because his "family was unaware of his alleged criminal conduct, and due to the private nature and use of electronic devices in his purported offenses, it would be difficult for defendant's family to monitor him to the extent necessary to ensure his compliance with his conditions."

- *United States v. Timothy Brockerman*, 25-cr-133 (RDM) – Magistrate Judge Harvey granted government's motion to detain defendant charged with 18 U.S.C. 2422(b) where his romantic partner was an inadequate third-party custodian.

- *United States v. Victor Blythe*, 25-cr-253 (DLF) – Magistrate Judge Harvey granted government's motion to detain defendant charged with distribution and possession of child pornography where defendant's brother was proposed third-party custodian, noting "the alleged criminal conduct with which Defendant is charged occurred over the span of many years without detection by his family or community members." ECF 19-1 at 7.  Judge Friedrich upheld this decision on the defendant's appeal.

While 18 U.S.C. 3142 allows for release if a combination of conditions can "reasonably assure" the safety of the community, providing the same third-party custodian who failed to detect the defendant's prior criminal conduct with the responsibility of reporting future conduct does not meet the standard. The defendant did not just distribute child pornography to another person. He admitted to previously sexually abusing an infant, implied that he was the individual depicted in the distributed child pornography, and sought out several individuals online to trade child pornography.

A third-party custodian is not appropriate in this case.  In *United States v. Hoppe*, No. 23-CR-102, the defendant traveled to a hotel in Virginia intending to rape an eight-year-old girl.  The defendant sought to be released to home incarceration under the custodianship of her aunt.  Judge Contreras rejected that proposal as wholly inadequate to assure community safety given the nature of the allegations:

> The Court is not convinced that these proposed conditions would reasonably mitigate the risk Defendant's release would pose to the community. First, it is generally true that, in cases "involving illicit online conduct involving a minor, a defendant cannot establish that an appropriate third-party custodian exists, since, given the ubiquity of internet-capable devices, ensuring against continuing illegal conduct on release often presents insurmountable challenges." *United States v. Dhavale*, No. 19-mj-92, 2020 WL 1935544, at *5 (D.D.C. Apr. 21, 2020). That principle applies foursquare here. Defendant's papers make clear that her proposed third-party custodian has multiple internet-capable devices in her home, including a computer, an iPad, and a cellphone. *See* Def.'s Suppl. Mot. at 3. Defendant asserts that these devices would be difficult to access for multiple reasons. *See id.* But Defendant does not assert that her aunt would be able to monitor her at all hours of the day. Nor is the Court persuaded that Defendant would be unable to access any other internet-capable devices. Defendant "needs only a hand-held device to access and/or distribute child pornography." *See Galarza*, 2019 WL 2028710, at *6. And because Defendant's aunt cannot provide round-the-clock monitoring, "the absence of such small devices in [Defendant's aunt's] residence cannot be meaningfully verified on a continuous basis." *See id.*

*United States v. Hoppe*, No. 23-CR-102, 2024 WL 1990452, at *6 (D.D.C. May 6, 2024) (Contreras, J.). The same concerns apply here. Even if a magistrate court ordered that the defendant could not have any internet-capable devices, there is no plan in place for ensuring that he would follow this but for *his mother*'s monitoring—not Pretrial Services. A third-party custodian could not "provide round-the-clock monitoring," and "the absence of such small devices in [the] residence cannot be meaningfully verified on a continuous basis." Moreover, Pretrial Services indicated that they would not approve the defendant's mother's residence for release. D.C. Housing Authority has also indicated that the defendant cannot reside at his mother's residence.

Indeed, district courts in this jurisdiction have recognized the challenge faced by third-party custodians—who are essentially being asked to act as correctional officers 24 hours a day for someone about whom they care deeply—and have repeatedly rejected such arrangements as inadequate to reasonably assure community safety. *See, e.g.*, July 24, 2023, Hr'g Tr. 24:14–25, ECF No. 20, *United States v. Gorham*, 23-CR-206 (D.D.C. Aug. 17, 2023) (Berman Jackson, J.) ("I'm concerned that she doesn't have the distance or independence to be his supervisor, and essentially his jailer, after being under U.S. Probation Office supervision while married to her wasn't enough to do

the trick.  And I'm not sure it's appropriate to put her in the position of searching his car every day."); Order at 9, ECF No. 54, *United States v. Cunningham*, 23-CR-7 (D.D.C. Mar. 13, 2023) (Cobb, J.) (same) ("[A] third-party custodian, no matter how competent or dedicated, cannot stand in the shoes of the defendant.  Nor should a third-party custodian be cast in the role of jailer.  To do so is neither realistic nor fair to the custodian. . . . [The defendant's] custodians cannot supervise his behavior on a 24/7 basis."); Order at 14, ECF No. 18, *United States v. Wright*, 22-CR-410 (D.D.C. Dec. 23, 2022) (Cooper, J.) (same) ("But family members are not correctional officers.  Nor should they be expected to play that role"); Order, ECF No. 14, *United States v. Joyner*, 22-CR-252 (D.D.C. Aug. 3, 2022) (McFadden, J.) (same); Order, ECF No. 55, *United States v. Handy*, 22-CR-164 (D.D.C. June 21, 2022) (Walton, J). (same), *aff'd*, Case No. 22-3045 (D.C. Cir.).

And in *Blackson*, then–Chief Judge Howell reversed the magistrate court's release order and discussed the inadequacy of a similar third-party custodian arrangement:

> The proposed conditions impose responsibilities similar to those of full-time and professional employees at detention facilities, but without the benefit of shifts or breaks in service as custodian.  Defendant's mother's capability to uphold those conditions long-term is questionable.  Certainly, the Magistrate Judge attempted to assuage skepticism about the long-term ability of defendant's mother to fulfill all the proposed conditions, and defendant's mother obliged by affirming her willingness and ability to do so.  Regardless of whether defendant's mother is a pillar of the community with ties to local government and law enforcement, she was and has been part of defendant's support community that unsuccessfully kept him out of the court system following his release only last May.  She is currently permitted to work from home for "maybe two or three months for now" and after that, she will have to "see" about her ability to work remotely every day.  Defendant argued that other individuals were approved as third-party custodians to cover gaps in his mother's availability, but that risks inconsistency in the conditions of home incarceration that, as of now, are completely placed on his mother.  To be clear, a benefit of professional detention facilities is the consistency in insuring detention conditions.  Defendant's ability to obtain a fully loaded and unregistered gun while on probation, despite the family support he enjoys, underscores that the best intentions and most valiant efforts of defendant's mother to fulfill all the proposed conditions provide no guarantee these conditions will be maintained to the letter for the duration, possibly many months, of defendant's pretrial proceedings.

*Blackson*, 2023 WL 1778194, at *12 (record citations omitted).

As noted by the Court in *Breeden*, "[w]hile [Pretrial Services] would be in a position to provide GPS monitoring if defendant is equipped with an ankle bracelet, and it would be alerted if he left the house, it does not have the capacity to monitor compliance any of the other conditions, including whether defendant was ever left unsupervised in the home, whether he used a computer, whether he accessed sexually-explicit or dating websites or engaged in troubling chats or communications, and whether he had contact with any minors. In other words, it would be the defendant's parents, and the defendant's parents only, who would be charged with monitoring and enforcing the conditions of release." 2015 WL 13310427 at *6. This highlights the concern with third-party custodians in cases involving online crimes, as discussed *supra*.

This Court cannot be assured that the defendant will follow the conditions of release and cannot ensure community safety if he remains released.

## CONCLUSION

For the foregoing reasons, the magistrate court erred in setting conditions of release. Nothing short of detention is adequate to protect the community in this case. The government respectfully requests that this Court reverse the magistrate court's release order and detain the defendant pending trial.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Dated: September 24, 2025          By:   */s/ Janani Iyengar*
Janani Iyengar
NY State Bar 5225990
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia

26

601 D Street NW
Washington, DC 20530
(202) 252-7760